# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs June 3, 2014

## STATE OF TENNESSEE v. PHILLIP HARRIS

**Appeal from the Criminal Court for Shelby County**
**No. 08-03680    Honorable Chris B. Craft, Judge**

---

**No. W2013-01028-CCA-R3-CD  -  Filed August 13, 2014**

---

The Defendant-Appellant, Phillip Harris, was indicted by a Shelby County Criminal Court Grand Jury for six counts of attempted second degree murder and one count of unlawful employment of a firearm during the attempt to commit a dangerous felony. Following a jury trial, Harris was convicted of one count of attempted second degree murder (count two), five counts of misdemeanor reckless endangerment (counts one, three, four, five, and six), and one count of unlawful employment of a firearm during the attempt to commit a dangerous felony (count seven). The trial court sentenced Harris to twelve years for the attempted second degree murder conviction and to a mandatory consecutive sentence of six years for the unlawful employment of a firearm during the attempt to commit a dangerous felony. The court also imposed sentences of eleven months and twenty-nine days for each of the reckless endangerment convictions and ordered these sentences served concurrently with the sentence for attempted second degree murder. On appeal, Harris argues: (1) the evidence is insufficient to sustain his convictions, and (2) his sentence is excessive. Upon review, we affirm the convictions and remand for resentencing as to the conviction for attempted second degree murder.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed and Remanded for Resentencing**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ALAN E. GLENN, J., joined and JEFFREY S. BIVINS, J., not participating.

Joseph A. McClusky, Memphis, Tennessee, for the Defendant-Appellant, Phillip Harris.

Robert E. Cooper, Jr., Attorney General and Reporter; Tracy L. Alcock, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Marianne L. Bell and Alexia Crump, Assistant District Attorneys General, for the Appellee, State of Tennessee.

# OPINION

## Trial

### State's Proof

Redell King, one of the victim's in this case, testified that he was nineteen years old and was attending college at Southwest Tennessee Community College where he played wheelchair basketball. He stated that on March 18, 2008, when this incident occurred, he was fifteen years old and was out of school for spring break vacation. That day, King, and his friends K.C. Carter, Rodney Allen, and Barkary Kassama, played basketball at Carter's home, located off of Ross Road in Memphis.

The young men played basketball for a few hours, and once they were finished, King returned a cell phone he had found to its owner on Ross Road. Then King, Allen, Kassama, and Carter walked to Lake Point Park, where they hung out "just being teenagers" and talked to girls. A few minutes later, Paul O'Bannon and Durrell Mickens arrived at the park. King said that he knew Mickens from school but did not know O'Bannon. When it began getting dark, King and his friends left the park and walked to Allen's friend Jermaine Curtis's house, which was located on Nelson Way Drive, off of Ross Road.

King, Allen, Kassama, Carter, O'Bannon, and Mickens walked as a group to Curtis's house. When they arrived, Allen walked up to the door and rang the doorbell while the rest of group stayed at the curb. At the time, Curtis's porch light was on and a motion light on the side of the house also became illuminated when the group walked toward Curtis's house. King stated that this motion light was "very bright" and remained illuminated the entire time they were standing outside Curtis's home. When no one answered the door, Allen walked back to the group at the curb.

King stated that when they were about to leave Curtis's house, a second group of five older men, whom he did not recognize, came up the street and yelled, "[W]ho is that? Who is that?" King said that at the time, he did not know that there was going to be a fight near Curtis's house. These men approached O'Bannon in the street and began arguing with him. He said these older men were of varying heights, and the majority of them had a light skin tone. He also said that three of them had dreadlocks. O'Bannon began walking backward and one of the older men, later identified as Harris, approached King and his friends at the curb and displayed two guns while the other men in his group approached O'Bannon. King said Harris got within one or two feet of him. Harris pointed the guns at King and his friends and informed them that if "any young black American man move[d], he was going to lay [him] out." King said that when Harris pulled out his two guns, he aimed both guns at his

head and his friends' heads. When the group approached Harris, Harris told them to "handle [their] business[,]" and the men began beating up O'Bannon. O'Bannon eventually broke free of the men and ran up the street to Ross Road. At the time, King thought, "Just let me get away. Just let me . . . just let me live. I didn't know what [Harris] was going to do."

King said that he could clearly observe Harris, who had the two guns. He stated that in addition to Harris being older than him and his friends, Harris was also approximately six feet tall, with medium skin tone, long deadlocks, and no facial hair. He did not remember what Harris was wearing but recalled that both of Harris's guns were black. King said that he did not see anyone other than Harris with a weapon that night.

When O'Bannon began running, Harris turned away from King and his friends and pointed his guns in O'Bannon's direction before firing four or five gunshots at O'Bannon. King saw the fire coming from the first gunshot as Harris fired shots at O'Bannon. When King heard the gunshots, he ran in the opposite direction from O'Bannon through an open gate into Curtis's backyard and kept running until he reached the opposite fence, where he tried to jump over the fence. When he climbed up the fence, he realized that he could not jump down the opposite side of the fence because "sticky bushes" and a tree were in the way. He ran to a different part of the fence where there were no bushes or trees. When he climbed to the top of this section of fence, he felt like he "was wobbling" and began falling backward. He said, "[S]omething came to me that I was shot." He acknowledged that he never saw Harris shooting in his direction because he never looked behind him. He also acknowledged that he did not know whether another member of the other group shot a weapon during the incident. King said that Carter and Allen were ahead of him when they ran into Curtis's backyard. He did not know where Mickens or Kassama were at the time.

King said that after he fell from the fence, he "stayed still" because he did not know if Harris was still chasing him and his friends. He stated that after Harris fired the gunshots at O'Bannon, there was a thirty second pause before he heard three to four additional gunshots before he tried to jump over the fence. He could not determine the direction from which this second round of shots was fired. After several minutes, he saw people inside Curtis's house, and he began crawling on his stomach toward the home. At the time, King thought he might be dying. When he saw blue lights in front of Curtis's house, King yelled for help. He said an officer found him in the backyard and asked him what happened. He told the officer what he had seen, and the officer called for additional officers to assist with the scene. King was then transported to the Regional Medical Center at Memphis by helicopter.

King was shot in the upper, middle part of his back, which rendered him permanently paralyzed from the chest down. During surgery, physicians removed blood around the bullet

and removed fluid from the left-side of his leg. King underwent physical therapy and remained hospitalized for one or two months.

On March 25, 2008, King talked to officers about the incident. The officers showed him a photographic lineup, and King, while alert and not under the influence of any drugs, identified Harris as the man with two guns who pointed the gun at him and who shot at O'Bannon. He stated that the officer did not tell him that the shooter would be in the photographic lineup and did not give him any hints or suggestions as to who to choose in the lineup. He also stated that no one else told him whom to chose in the lineup. King testified that he was one hundred percent sure that the photograph he identified in the lineup was the man who had pointed the gun at him and who had pointed the gun and shot at O'Bannon.

King identified Harris in the courtroom as the man who had displayed and shot the two guns on March, 18, 2008. He stated that he was a hundred percent sure that Harris was the man who pointed the gun at him and who pointed the gun and shot at O'Bannon. King asserted that he remembered Harris's face and specifically remembered Harris's chin and facial expression during the incident. He said that Harris was the only person who had threatened him and the only person he had seen holding a gun during the incident.

Rodney Allen, another victim, testified that on March 18, 2008, he was sixteen and in the tenth grade. That day, he played basketball with King, Carter, and Kassama near Ross Road. After they finished their game, the group walked to the Lake Point Park, where they saw Mickens and O'Bannon, whom Allen knew from school.

Between approximately 7:40 p.m. and 8:00 p.m., Allen, King, Carter, Kassama, Mickens, and O'Bannon left the park and walked down the street to Curtis's house. When they arrived, it was not yet dark, and Allen asked his friends to stay at the curb because Curtis's mother did not know them. Allen knocked on the front door, but no one answered.

As Allen and his friends began to leave Curtis's house, another group of five "much older" men approached them. He said these older men came from two houses down, in the direction opposite the park. These men said, "[W]ho is that?," and Paul O'Bannon said, "[T]his [is] Paul." The men continued to approach Allen and his friends, and Harris began talking to O'Bannon. At that point, the motion light at the corner of Curtis's home became illuminated, and the motion light and the light from Curtis's porch allowed Allen and his friends to clearly see the older men's faces and allowed them to see that Harris had two guns. Allen said he recognized Turrell, or T.B., because he had "seen him around." He also recognized Harris because he had sold him a puppy a year earlier, and had previously had no problems with him. Allen said that T.B. walked toward O'Bannon like he was going to hit him, and Harris, who was still holding the two guns in his hands, said, "If that's [O'Bannon],

-4-

hit him." Allen said Harris wore a black shirt and had dreadlocks, which he wore down. He noticed that some of the other men in Harris's group had dreadlocks, but the only two men that he knew in the group were T.B. and Harris.

When T.B. approached O'Bannon, O'Bannon began walking backward and stated, "This ain't what you think." As Allen and the rest of his friends tried to leave, Harris pointed a gun at Allen's head and waved a gun at Allen's friends and said, "[If] one of y'all move again I'm going to shoot one of y'all." Allen explained that Harris raised only one gun during the incident, although he was holding another gun "like he was ready to use that [one] too[.]" Allen and his friends did not move after Harris's threat.

Then, Harris, who still had his guns raised, walked behind T.B. like he was going to help T.B. hurt O'Bannon. O'Bannon "took off running," and Harris began shooting at O'Bannon. Allen saw Harris fire his first shot at O'Bannon and said that Harris fired a total of two or three shots at O'Bannon. Allen identified Harris in the courtroom as the man who shot the guns the night of the incident. He stated that he did not see anyone else with a weapon that night.

When Allen and his friends heard the first shot, they ran through Curtis's gate to the backyard, where they jumped the fence and ended up at Holmes Road. All of his friends, except for King, arrived at Holmes Road. Allen said Harris probably shot toward them when they ran, but he was unsure because he was running away from Harris. After the shots were fired in O'Bannon's direction, Allen heard additional shots as he was jumping over the fence but could not determine whether they were coming toward him or not. He did not know how many additional shots he heard because he was running, although the gunshots were "[c]onstant[.]" Allen learned that King had been shot when he called Curtis that night. He returned to Curtis's home later that night to speak to the police about the incident. Allen said he told the police that the shooter's nickname was "Phil" because he did not know his full name at the time.

Allen acknowledged that he did not know whether someone other than Harris pulled out a gun and began shooting. He did not recall telling the police that he was unable to describe the person shooting the guns because the street was really dark and that he did not know any of the other men in the group.

Paul O'Bannon, who was a few years older than the other victims, testified that approximately a week prior to March 18, 2008, he witnessed an incident involving his neighbor Edgar (last name not provided), and Tony Brown, also known by the nickname of T.B., at a car wash. O'Bannon explained that he and Edgar were "like brothers" and that he knew T.B. through mutual friends, although Edgar and T.B. disliked one another. During

this incident, which occurred prior to March 18, 2008, O'Bannon rode with Edgar to the car wash at the intersection of Riverdale Road and Holmes Road and saw T.B. washing his car. When O'Bannon greeted T.B., Edgar began "acting funny . . . like he was up to something." Shortly thereafter, some of Edgar's friends arrived at the car wash, got out of their truck, and beat up T.B. O'Bannon stayed in his car during the fight because he did not want to be involved. After Edgar's friends beat up T.B., they left, and Edgar drove his car around to look at T.B. As they got close, O'Bannon and T.B. "locked eyes," which made O'Bannon think that T.B. believed he set him up because O'Bannon had just talked to T.B. before the fight. O'Bannon insisted at trial that he had nothing to do with T.B.'s beating. He said he tried to contact T.B. about the incident at the car wash but was unable to get in touch with him.

On March 18, 2008, O'Bannon planned on working the late shift that night at Fed Ex starting at 9:30 p.m. O'Bannon, Edgar, and Mickens went to the park that afternoon, where they saw Allen, Carter, and someone whose name he could not remember. They hung out at the park for a while, and Edgar left the park to go home. When Edgar left, O'Bannon walked with Carter, Allen, Mickens, and the guy whose name he could not recall, to "the other neighborhood" on Nelson Way Drive off of Ross Road. He said he did not go to this neighborhood to fight T.B.

When the group walked halfway down Nelson Way Drive, they heard ask, "[W]ho is that?," and he replied, "Paul . . . who is that?[,]" and the other man replied, "T.B." O'Bannon was not concerned, and he and his friends continued to walk down the road. T.B. approached O'Bannon as if he wanted to fight. Suddenly, five or six men came from the house where they had been standing, and O'Bannon began wondering what was going on. At that moment, O'Bannon realized that T.B. thought that he had set him up at the car wash. O'Bannon recognized Chris and Chris's brother Pee-wee, who were also in T.B.'s group. He also recognized Harris,[1] who he had seen "[a]round the area," although he had never had

---

[1] The parties stipulated that O'Bannon was asked the following questions and gave the following responses when he testified under oath on April 16, 2008:

> Q.   Now, this person that had the gun that you saw is this someone you'd ever seen before that night?
> A.   No.
> Q.   Okay. Would you recognize him if you saw him again today?
> A.   Yeah.
> Q.   Is he present in the courtroom today?
> A.   Yeah.
>
> [O'Bannon then identified Harris under oath as the person he saw with the gun on March

(continued...)

any trouble with him. O'Bannon said that Harris was "a little bit taller" than him, had lighter skin than him, and wore his dreadlocks down that night. He said Harris stood out because he was "the tallest one out there." He said he did not know where his friends were standing at the time because he was concentrating on T.B.

O'Bannon said that when the rest of T.B.'s group approached him, he took a step back. He and the men in T.B.'s group exchanged a few words, and Harris asked T.B. if O'Bannon was one of the guys who jumped him, and O'Bannon said, "[N]aw." Harris displayed one gun, which he pointed at O'Bannon's face and neck. He was unsure whether Harris had a second gun in his other hand. When O'Bannon saw the gunfire from Harris's first shot, he closed his eyes because he thought he had been shot. When he heard the second shot, he took off running.[2] O'Bannon said Harris was standing ten to fifteen feet away from him when he fired the first shot at him and was able to see Harris's face as he shot the gun, even though it was "getting dark" outside. He identified Harris in the courtroom as the person who shot at him the night of the incident and was one hundred percent certain of his identification. When he heard the first gunshot, O'Bannon believed that he had been hit. When he realized that he had not been shot, he ran and "heard several more shots" as he ran toward Ross Road.

Once he escaped, O'Bannon went home. He later got in his car and drove around the area, but the police had the area closed, and he returned home. The next day, when he spoke to officers at the police station about the incident, O'Bannon said he did not tell them everything that happened because he did not like the manner in which the officers "pulled [him] out of [his] house like [he had] committed a crime." O'Bannon said that Harris was the only person he saw holding a gun on the night of March 18, 2008.

O'Bannon admitted previously testifying that he and his friends went to the neighborhood on Nelson Way Drive to see a fight that was unrelated to T.B.'s beating at the

---

[1](...continued)
18, 2008].

[2] The parties also stipulated that O'Bannon was asked the following questions and gave the following responses when he testified under oath on April 16, 2008:

Q.     Did you actually see the gunfire?
A.     No, sir.
Q.     Is that because you were running away from the gun?
A.     Yes, sir.
Q.     But you're certain about who had that gun?
A.     Yes, sir.

car wash. He said he did not know if the fight he was going to see ever occurred because the incident with T.B. and Harris prevented them from going to the area.

K.C. Carter, still another victim, testified that on March 18, 2008, he was fifteen years old and in the ninth grade. That day, he played basketball with Allen, Kassama, King, and Mickens in their neighborhood near Ross Road before walking with them to the park near Ross Road. They saw O'Bannon at the park and stayed there talking until it started to get dark outside. Around 7:30 p.m., Carter, Allen, Kassama, King, Mickens and O'Bannon left the park and walked to Curtis's house.

When they got to Curtis's house, Allen knocked on the front door while the rest of the group stayed behind in the driveway. When no one answered the door, Carter and his friends began to leave the home when five to seven men that he did not know approached and began asking them questions. Carter said these men looked older than him and his friends and appeared to be in their twenties.

While most of the men in the other group approached O'Bannon, Harris, approached Carter and his friends, waived his two guns in their faces, and told them that he would shoot them if they moved. Carter said Harris's two guns were black in color and looked like "40 cals." He said Harris was six feet, three or four inches tall, had dreadlocks that he wore down, and had one gold tooth.

After Harris threatened to shoot Carter and his friends, Harris told T.B. to "get" O'Bannon. When Harris and T.B. began walking toward O'Bannon, Carter saw Harris fire two or three shots in O'Bannon's direction. When O'Bannon fell and got up and began running, Carter and his other friends ran into Curtis's backyard and tried to find the best place to climb over the fence because there were woods on the other side. When they got to the top of the fence, they heard three or four gunshots in their direction, two of which hit the fence, so they knew the shooter was close. Carter acknowledged that he not see who was shooting at the fence. He and his friends jumped over the fence, fell into the woods on the other side, and ran to a four-way stop at the nearest street. At that point, they realized that King was not with them.

Carter later discovered that King at been shot in Curtis's backyard. He talked to the police about the incident and identified Harris from a photographic lineup. Carter stated that the officer that showed him the photographic lineup did not tell him that the shooter was in the lineup and did not give him any hints about which photograph to select. He chose Harris's picture because Harris was the "person that [he had] seen outside that was pointing the guns towards our way. That was aiming all in my face." He said that although he had never seen Harris before the incident, he would never forget Harris's face because the

incident was "like a nightmare[.]"  Carter said that he was one hundred percent sure of his identification of Harris as the man who pointed the guns at him and his friends the night of the incident.  Carter also identified Harris in the courtroom as the person who had the two guns during the incident.  He confirmed that Harris was the only person that he saw with a weapon the night of the incident.

Carter said Harris was the only person in the other group with dreadlocks.  However, he admitted that he could not see the other people in Harris's group because Harris was the only man that got close to him and his friends.  Carter said he told the police that Harris had dreadlocks and one gold tooth but did not recall telling Sergeant Cunninghan that the person who pulled the guns on them was tall and skinny with dark skin.  He admitted that he had no idea who fired the gunshots at him and his friends in the backyard and did not know the origin of those gunshots.  He also admitted that someone other than Harris could have pulled out a weapon and begun firing shots.

Bernard Cleveland, who lived on Nelson Way Drive, testified that on March 18, 2008, at 6:30 or 7:00 p.m., he heard two or three gunshots outside his home.  He looked out his window and saw five to seven men quickly get into their vehicles and leave the house across the street.  He was able to see these men well because it was still light outside.  Cleveland did not see any of these men carrying a weapon and did not see any shots being fired.

Cleveland saw the men get in three different vehicles, a green Ford Expedition, a red Pontiac Sunfire, and an Oldsmobile, before driving away from the scene.  He said at least two of the men, around twenty years of age, got into the Expedition and at least two men got into the Sunfire and the Oldsmobile.  The Expedition and the Oldsmobile traveled west and the Sunfire traveled east on Nelson Way Drive.  Cleveland said it took approximately thirty minutes to drive from his house to downtown.

When Cleveland heard the shots, he told his fiancé to call 9-1-1.  After the three vehicles left the scene, Cleveland went outside and saw his neighbor across the street.  As he talked his neighbor about what had just happened, he saw a Pontiac Sunfire, that appeared to be the same car that had just left the area, return to the neighborhood.  He said a woman was driving the Sunfire, and a man was riding in the passenger seat.  The man, a young African-American male with a slim build and dreadlocks, took off his shirt and threw it underneath the car next to the Sunfire before getting back inside the Sunfire and leaving the neighborhood.  Approximately two minutes later, a sheriff's deputy arrived at the scene.  Cleveland said that the deputy arrived from the same direction that the Sunfire had just left the neighborhood.

Rhonda Davis, the Shelby County Sheriff's Department Communication Specialist, testified that she was the keeper of the records for all 9-1-1 calls. On March 18, 2008, she stated that the Sheriff's Department received six 9-1-1 calls from the area near Nelson Way Drive.

She said the first call was received at 8:01 p.m. from Larry Brown at 6681 Nelson Way Drive. Brown told the dispatcher that "there were subjects shooting in the area" and that one of the subjects was armed with a pistol. A second call was received at 8:02 p.m. from 6685 Nelson Way Drive, and this caller stated that she had heard eight to nine shots behind her house. A third call was also received at 8:02 p.m. from a caller who was "next door to 6696 Nelson Way Drive" and who stated that shots had been fired. The fourth call was received at 8:03 p.m., via a cellular phone, from Martha Hunt at 6662 West Spencer Forest Cove, who said that she had heard approximately ten gunshots from a field behind her house. A fifth call was received at 8:05 p.m. from 6609 Silver Oak Cove. The caller stated that he was walking his dog when he saw four or five juveniles running across his neighbor's yard and around a corner. The sixth call was received at 8:06 p.m., and the caller stated that she had seen subjects get into a green Ford Expedition and a red vehicle and leave the crime scene.

James Stroud, a patrolman with the Shelby County Sheriff's office, testified that on March 18, 2008, he received a call that shots had been fired on Nelson Way Drive. His report indicated that the shots had been fired between 7:40 p.m. and 8:00 p.m. The call stated that cars, including a green Ford Expedition or Explorer and a red vehicle, had been at the crime scene. Officer Stroud got to the scene within a few minutes of the call but did not see vehicles matching those descriptions. When he investigated the scene, he found over twenty .40 caliber shell casings in the street east of 6665 Nelson Way Drive near Ross Road. He then talked with several witnesses in the neighborhood, who told him that some African-American men had been shooting west down Nelson Way Drive.

As Officer Stroud looked for rounds that might have gone in nearby houses, he heard someone moaning. He walked into the fenced-in backyard of a home in the 6000 block of Nelson Way Drive and found an African-American male juvenile, later identified as Redell King, lying on his stomach. King appeared to have a gunshot wound in his back but was able to talk. Officer Stroud called an ambulance for King before securing the crime scene and calling for detectives. Officer Stroud stated that he did not find any shell casings in the backyard and that all the shell casings were in the front yard.

James Sneed, a sergeant with the homicide unit of Shelby County Sheriff's Department, testified that he responded to the shooting at 6665 Nelson Way Drive on March 18, 2008. He observed and collected nine .40 caliber shell casings, from different

manufacturers, near 6665 Nelson Way Drive. He found four of these casings in the front yard of 6665 Nelson Way Drive and five of these casings in the street near the drainage area. He also observed several holes, that looked to be bullet holes, in the six foot fence at the property located at 6665 Nelson Way Drive. Sergeant Sneed also found a bullet hole in the glass next to the front door of a home at 6690 Nelson Way Drive, which was east of the home located at 6665 Nelson Way Drive. When he inspected the home, he found that the bullet had entered the home through the front door and traveled through the den and out the rear window of the home. He found a bullet fragment near the bullet hole near the home's rear window.

Lewis Chapman, a deputy with the Shelby County Sheriff's Department, testified that on March 24, 2008 was asked by a supervisor to conduct surveillance and to locate Harris. He was told that a green Ford Expedition was seen leaving the scene, and he obtained Harris's drivers license photograph so that he could identify him. He parked his unmarked, white Ford truck in an area of southeastern Shelby County where his supervisor had told him to go and waited for a green Ford Expedition to enter the area. As he was waiting, he saw a green Ford Expedition pass his car from the rear and park in front of a home a short distance away. He then saw an African-American male, who was approximately six feet tall with dreadlocks and who was wearing a t-shirt and shorts and carrying a gym bag, exit the green Expedition and walk through the front door of the house. Deputy Chapman concluded that the man who entered the home appeared to be Harris. He quickly informed his supervisor that he had possibly located Harris. He then told Lieutenant Hubbard that he had located a subject driving a green Ford Expedition that matched Harris's description. Shortly thereafter, several officers arrived at Deputy Chapman's location and entered the home. Deputy Chapman identified Harris in the courtroom as the man he had seen driving the green Ford Expedition on March 24, 2008.

Chris Harris, a sergeant with the Shelby County Sheriff's Department, testified that on March 24, 2008, he received a call from Lieutenant Hubbard that Harris had been located at a home at 6310 Harvest Run. Sergeant Harris told his team of officers to go to that location. When Sergeant Harris arrived at the scene, he saw an older model green Ford Expedition parked in front the home. Several of the officers approached the home and knocked on the door. A woman, later identified as Harris's mother, answered the door, and the officers asked for Harris. When Harris appeared, Sergeant Harris concluded that he matched the description and photograph they had. He told Harris that detectives wanted to talk with him, and the officers handcuffed him before transporting him downtown. Sergeant Harris identified Phillip Harris in the courtroom as the man he saw at the 6310 Harvest Run address on March 24, 2008.

Sergeant Harris obtained consent from Harris's mother, Paula Mickens, to search the home and the green Ford Expedition, which belonged to her. Inside Harris's bedroom, he found a gun box, a holster, a shooting target, and ammunition in a box next to the bed but did not find a weapon. The ammunition box contained Federal .40 caliber ammunition, but four of the bullets were missing. The gun box contained the label "Mauser M2 pistol 40 caliber Smith and Wesson." He stated that even though the missing gun was a Smith and Wesson, it was capable of firing bullets of the appropriate caliber from other manufacturers, such as Winchester and Federal. Sergeant Harris did not discover any weapons or ammunition during his search of the Expedition. He stated that Harris and Mickens cooperated with the officers on March 24, 2008.

Richard Goforth, a detective with the Shelby County Sheriff's Department, testified that on March 28, 2008, he was instructed by Sergeant Pam Hazel to photograph a vehicle located at 6310 Harvest Run Cove, Memphis, Tennessee. After obtaining written consent from Paula Mickens to search the 1997 Ford Expedition, Detective Goforth searched and photographed the vehicle. During his search he found a Tennessee license tag on the car's floorboard, a direct deposit statement from the Hershey Company payable to Phillip A. Harris at 6310 Harvest Run Cove inside the passenger side door pocket, and men's shoes under the car seat.

Reginald Hubbard, a lieutenant with the narcotics division of the Shelby County Sheriff's Department, testified that he was the lead detective in the shooting case at 6665 Nelson Way Drive. By the time Lieutenant Hubbard got to the crime scene on March 18, 2008, it was nighttime and the crime scene was in "chaos," with ambulances, patrol cars, and neighbors standing outside. He talked with six to ten witnesses that night and instructed other officers to collect evidence in the case. Lieutenant Hubbard stated that Bernard Cleveland, a next-door neighbor, told him that he had seen a green Ford Expedition, a red Pontiac Sunfire, and a white vehicle leave the area that night. Cleveland also told officers that an African-American in a red Sunfire returned to the scene and threw his shirt under another vehicle. Lieutenant Hubbard stated that the suspect who returned in the Sunfire was located, but because he did not match the descriptions given by witnesses at the scene, other than the fact that he had dreadlocks, he was released after he refused to cooperate. He said this suspect's picture was never placed into a photographic lineup and was never shown to witnesses in this case. Another witness told him that the suspect in the shooting was tall, approximately six feet, one inch tall, and weighed between 175 to 195 pounds. Lieutenant Hubbard asked patrol officers familiar with the area to look for the three vehicles Cleveland had described. He said that one of the patrol officers knew that Phillip Harris drove a green Ford Expedition and located Harris and the vehicle a few days later.

After learning that Harris drove a green Ford Expedition, Lieutenant Hubbard included Harris's picture in a photographic lineup. On March 25, 2008, Redell King positively identified Harris from the lineup. That same day, K.C. Carter also positively identified Harris in the photographic lineup. Carter said Harris was tall, was "bright-skinned[,]" and wore his hair in long dreadlocks. Lieutenant Hubbard stated that it took King and Carter less that one minute to identify Harris as the perpetrator in the photograph lineup.

Shelly Betts, a special agent with the firearm identification unit of the Tennessee Bureau of Investigation, was declared an expert in the area of firearms identification and ballistics. She examined the nine fired .40 caliber shell casings and the one fired projectile that were collected as evidence in this case. Of these nine shell casings, two were Remington .40 caliber fired shell cases, two were Federal .40 caliber fired cartridge cases, two were Winchester .40 caliber fired cartridge cases, and three were Speer .40 caliber fired cartridge cases. She concluded that all nine of the shell casings had been fired from the same weapon because they all had the same mechanical fingerprints. She also examined the fired projectile, but because the copper jacket was not recovered from the crime scene and the lead bullet never contacted the gun, she was unable to identify the caliber of gun that fired that projectile and was unable to connect that projectile to a particular handgun.

Agent Betts stated that most .40 caliber handguns are semi-automatic pistols that can hold ten to fifteen rounds. She said Mauser is a German manufacturer that makes rifles and handguns, including a .40 caliber handgun that can fire the type of bullet matching the shell casings collected as evidence in this case. However, she said that she could not determine whether the bullet casings had been fired from a Mauser firearm without examining the specific Mauser handgun. After examining the gun box that was found in Harris's bedroom, she concluded that the gun originally sold in the box was a Mauser .40 caliber Smith and Wesson M2 semi-automatic pistol. She also concluded that the box of ammunition found in Harris's bedroom contained nine Federal .40 caliber hollow point shells, that were originally sold in the ammunition box, and seven reloaded .40 caliber shells from a different manufacturer that were placed in the box after it was sold. She stated that all sixteen shells in the ammunition box could have been fired from a Mauser .40 caliber Smith and Wesson M2 semi-automatic pistol.

### Defense's Proof

Wanda McKinnon, the Senior Human Resource Business Partner for the Hershey Company in Memphis, Tennessee, testified that Harris was hired by the Hershey Company in March 2007 as an assembly worker. She explained that employees of the Hershey Company have to scan their badges to access the building and the building's parking lot.

McKinnon said the company keeps journal reports documenting each employee's unique number and the times the employee scans his or her badge to access the building or the parking lot.

The Hershey Company's report shows that on March 18, 2008, Harris scanned his badge at the company parking lot at 8:43 p.m. and scanned his badge at the building at 8:47 p.m. The company's records also showed that Harris clocked into work at 8:50 p.m. on March 18, 2008, and then signed the training log for the training session. She said that it was not possible for someone else to have shown up to work on Harris's behalf because there were two security guards at the checkpoints at the parking lot and the building and because a supervisor who was familiar with Harris was at the training session. McKinnon explained that although Harris was scheduled to work from 10:00 p.m. to 6:00 a.m., the company had a mandatory training session at 9:00 p.m. the night of March 18, 2008.

Faith Cunningham, a lieutenant with the Shelby County Sheriff's Department, testified that she responded to the scene on March 18, 2008, and interviewed K.C. Carter and Rodney Allen. She acknowledged that Carter and Allen, who were fifteen and sixteen years old respectively, had been waiting in squad cars until she talked to them. She stated that although Allen and Carter both appeared scared and nervous, they cooperated with her. Carter told her that the person holding the gun was "dark skinned." When Lieutenant Cunningham asked him what the man holding the gun was wearing, Carter, replied, "I couldn't really see in the dark." When she asked him if he could see any of the men that shot at him, Carter, said, "[N]o ma'am. After we started running we [were not] looking back or nothing." Allen told Lieutenant Cunningham that there had been six people in the other group that night and that he said he did not recognize any of them. She said Allen never mentioned that he had bought a dog from one of the men in the group prior to the incident. When she asked him to describe the suspect, Allen said, "It was dark. This whole street is like pitch black." When she asked him if he could remember anything about the person with the guns, Allen replied, "[D]reads." Allen also said that the person with the guns was approximately six feet, three or four inches tall and weighed approximately 230 pounds. Lieutenant Cunningham acknowledged that Allen and Carter did not get a chance to review the transcripts of their recorded statements. She also admitted it was possible that the secretary who transcribed Allen's and Carter's statements could have misheard something during her transcription. She also acknowledged that witnesses are sometimes reluctant to identify an individual at the beginning of the case because they are scared. However, she admitted that Allen and Carter appeared truthful when talking to her about what happened.

Paula Mickens, Harris's mother, testified that in March 2008, Harris was twenty-five years old, lived at her house, and worked at the Hershey Company's factory downtown. She said that Harris had his own bedroom and his own set of keys to her home. On March 18,

-14-

2008, Ms. Mickens awakened Harris at 7:45 p.m. so that he could attend a safety meeting at work. She said that after she woke him, she saw Harris get ready for work, get his lunch, and leave her home by 8:15 p.m. She said Harris returned home the next morning on March 19, 2008, although she could not recall the exact time. She stated that the police came to her home on March 24, 2008, and placed Harris in handcuffs.

Ms. Mickens asserted that Harris did not drive her Ford Expedition on March 18, 2008, because he was asleep. That day, she drove the Expedition until around 5:30 p.m. because she was delivering packages for her job. When she returned home, she kept the keys for the Expedition with her. She later testified that on March 18, 2008, her last delivery was at 2:00 p.m., and she stayed home for the rest of the afternoon. She stated that although she allowed Harris to drive the Expedition, the car belonged to her, and Harris drove a PT Cruiser, which was Harris's primary car. Although she had two sets of keys to the Expedition, Harris never had the extra set of keys to the Expedition unless she deliberately gave them to him. She explained that Harris had to ask her permission to get the keys to the Expedition regardless of where he was going. Ms. Mickens stated that Harris usually drove his PT Cruiser to work and only drove the Expedition if his car was not operating. She testified that Harris had driven her Expedition to work only four or five times within the last year. She was not surprised that Harris left his shoes or his direct deposit slip in the Expedition.

Ms. Mickens stated that she did not own a gun. She knew that Harris owned a gun, although she did not know what kind, and knew that he kept it in his gun case in his bedroom. She also knew that Harris kept a holster, a target, and ammunition in a shoe box next to his bed. She said Harris had purchased the gun prior to his arrest on March 24, 2008, and she had never seen him leave the house with it. She said she had never seen Harris with two guns and had never noticed two guns inside her house. She asserted that Harris had applied for a gun permit prior to the offense in this case.

Ms. Mickens said that she was "devastated" when Harris was arrested on March 24, 2008. She cooperated with officers and allowed them to search her house and her Ford Expedition and allowed them to take photographs of her Expedition on March 24, 2008, and March 26, 2008.

Ms. Micken acknowledged that she had never told the police that she awakened Harris at 7:45 p.m. on March 18, 2008, for his safety meeting at work. She also acknowledged that although officers came to her home on March 24, 2008 and March 26, 2008, she never told them that Harris had been asleep on March 18, 2008, during the incident. She admitted that she never testified at her son's preliminary hearing and that the first time she had presented this alibi was at trial.

-15-

Phillip Harris, the Defendant-Appellant, testified that in March 2008 he was twenty-five years old and worked on the assembly line at the Hershey Company during the graveyard shift from 10:00 p.m. to 6:00 a.m. He said he was six feet, one inch tall and in 2008 wore his hair in dreadlocks, which he wore down. Harris said he owned a 2003 PT Cruiser, and his mother owned a Ford Expedition. Although his mother had a spare set of keys to the Expedition, he had to ask her for the keys before he could drive her car. He admitted that he had driven the Expedition to work on February 29, 2008, and to the gym on March 24, 2008. He said that because his mother did not work at night, he sometimes drove her Expedition to work.

Harris asserted that he drove his PT Cruiser on March 18, 2008, and did not go to Nelson Way Drive. He denied knowing T.B. and denied being with a group of people that night that included T.B. He said he did not spend time with his friends before going to work on March 18, 2008, because he was asleep. He claimed he did not have friends in his neighborhood because he was always at work.

Harris said he did not know Redell King, Paul O'Bannon, Rodney Allen, K.C. Carter, Barkary Kassama, or Durrell Mickens and had never had any arguments with these men. He denied shooting at any of the victims and claimed he was "not that type of guy." He said the shell casings found at the crime scene did not belong to him. He also asserted that he had never sold or bought a dog from Rodney Allen.

Harris admitted that King, O'Bannon, Allen, and Carter had identified him as the suspect in this case at his preliminary hearing and at trial. He also admitted that King and Carter had identified him in a photographic lineup as the person who threatened them and pointed the gun at them on Nelson Way Drive on March 18, 2008.

Harris said that his home was five to seven minutes away from Nelson Way Drive. He said he knew one person, Walter Watkins, who lived with his mother and younger brother, Christopher Watkins, a couple of houses down from 6665 Nelson Way Drive. Harris asserted that he did not spend any time with Walter Watkins on March 18, 2008.

At the time of the incident on March 18, 2008, between 7:45 and 8:00 p.m., Harris said he was waking up and getting ready to leave for work. He said his mother awakened him on March 18, 2008, around 7:45 p.m., as was her custom. He went to work, attended the safety meeting, completed his shift, clocked out, and played basketball and worked out at the YMCA gym in Whitehaven before returning home and going to sleep. He admitted that the first time he presented this alibi defense was at trial.

Harris acknowledged that the offenses in this case occurred around 8:01 p.m. on March 18, 2008. He said his home was a thirty to thirty-five minute drive from his work and that it would also take him thirty to thirty-five minutes to drive from Nelson Way Drive to his work. He acknowledged that the Hershey Company's records showed that he arrived at work at 8:43 p.m.

Harris said that he could remember what he did on March 18, 2008, because it was one of the worst days of his life and a day he would never forget. He explained, "I was accused of a crime that I did not do, [did not] have anything to do with it. I never seen these . . . guys a day in my life and they got my life on the line right now." He later acknowledged that March 24, 2008, was actually the worst night of his life because that was the night he was arrested. He said that he did not know that a shooting had occurred on March 18, 2008, until the officers informed him of it the day of his arrest.

Harris admitted that the police found a shooting target, gun box, holster, and shells in his room. He acknowledged that in 2007, he bought a .40 caliber semi-automatic handgun for safety purposes but asserted that he never owned two guns. He said he went to the shooting range every week and had applied for a gun carry permit on February 26, 2008. He said his handgun shot .40 caliber bullets.

Harris said he never discarded his weapon and that he "honest to God" did not know what happened to his gun. He said he realized that he his gun was missing when the police opened his gun box and told him that it was empty. He claimed his missing gun was "something totally new to [him] when the officers came to [his] house on that day and picked [him] up[,]" and assumed someone had stolen his gun. Although he said he had many friends who came over to his house to play video games and basketball, he did not know who could have taken his gun. The last time he saw his gun was around two weeks before his arrest.

Harris said he cooperated with officers on March 24, 2008. After his arrest, he told officers that he had not done anything wrong and had been at work the night of the shooting. He was later released and continued to work. In May 2010, Harris was fired from the Hershey Company because of the criminal charges associated with this case.

Harris asserted that he did not commit the crimes in this case and was "nowhere on the scene." Instead, he had a job and was "doing the right things in life." He claimed he would "never do something like this and head to work. That wouldn't make no sense."

## Sentencing Hearing
## State's Proof

The State admitted Harris's presentence investigation report into evidence at the sentencing hearing. It also entered documents showing Harris's arrest in Missouri for not wearing a seat beat and possession of marijuana, which resulted in a certified judgment of conviction for unlawful use of drug paraphernalia, a misdemeanor.

Redell King testified that he was fifteen years old when he was shot. He said that after he was shot, "[i]t felt like a dream, like a nightmare, but in reality it was real life." When he woke up in the hospital, King believed that he would regain the use of his legs. Over a period of time, he realized that he was paralyzed and would never be able to walk again, which changed his life forever.

Because of his catastrophic injury, King remained in the hospital for several months and sustained at least twenty bedsores. King said he had to repeat the ninth grade after he missed too many days of school because of his condition. He was home-schooled for ninth and tenth grade, and when he returned to school for eleventh grade, it was a "nightmare" because he was unable to control his bladder and was unable to do the things normal kids do. King said that he graduated high school and currently attended college. King said he also plays wheelchair basketball, which keeps him busy and motivated. He said he needs help dressing, showering, and using the bathroom and will need someone to take care of him for the rest of his life. King said, "I know that [Harris] might get up and say [he is] sorry, but I can't accept [his] apology, because it still hurts me on the inside . . . knowing that this happened to me."

Leanna King, King's older sister, testified that her brother's catastrophic injury affected her entire family. She said her brother's life is "so much different from what it used to be" because he needs help with everything, from showing to going to the bathroom, and it was "hard to see him like that." She said that before his injury, her brother was a football star in middle school and can never play the sport again. She said that he is no longer able to participate in the activities that he used to enjoy with his friends and family.

Ernestine King, Redell King's mother, testified that her son is one of nine children. She said that her family had just moved into the area where her son was shot six months before the incident. She said she moved her family because their old neighborhood had "so much crime," and she believed that the new neighborhood would be a better and safer environment for her children.

-18-

Mrs. King stated that it had been extremely hard to adjust to her son's inability to walk because she had to learn to take care of him, which included learning to pick him up and move him so that he would not get bedsores. She said her son missed the last part of his youth and can no longer run, walk, or play basketball. She said it has been difficult accommodating the doctors and nurses who check on her son three or four times a week.

Mrs. King described how her son's injuries had affected her life:

It has affected my life, tremendously. Actually, I don't have a life. My life is my son now. Everything that I do I've got to do for him. I can't really go places no more, like I used to, or want to do, because I've got to make sure that he is in the proper care, or be there with him at all times.

Mrs. King stated that her husband passed away in 2006 and that dealing with her son's injuries so soon after her husband's death "tore [her] whole family apart."

**Defense's Proof**

Phillip Harris, age twenty-nine, testified that he had lived in Memphis his entire life. He graduated from high school and attended a couple of years at Southwest Community College before taking a job at Nike, where he worked for two years. He then worked a few temporary jobs before attending Vatterott Career College, where he had two more months of training before earning his certification as a heating, air, and refrigeration technician. He also worked for the Hershey Company.

Harris, while still asserting his innocence, apologized for what happened to Redell King:

I still plead my innocence. I am deeply, deeply sorry for what happened to Redell King and his family, because it also could have happened to me, or my family. My prayers and my blessings do go out to you, you guys and your family.

And Redell, I am deeply sorry for what happened to you, even though it wasn't me, but I know what I am going through and I wish you the best in life.

Harris added, "You guys convicted the wrong guy, but I am still here to accept my punishment." He asked the court for the minimum sentence and asserted, "I am not a violent person, I am a good guy." Harris said he had no prior felony convictions but admitted that

he had one misdemeanor conviction for unlawful use of drug paraphernalia, stemming from his possession of marijuana while he was released on bond in this case. He stated that his misdemeanor conviction resulted in him being placed on unsupervised probation, which he had never violated.

Harris apologized a second time to Redell King and his family:

> Once again, I am deeply sorry. I wish y'all would accept my apolog[ies], but I understand, I deeply do understand, because it could happen to my little brother, I also have a little brother around the same age and it could have happened to him. But, I am deeply sorry for what happened to Redell King and I am so sorry [for] what his family has to go through, because it could have been my family also. But, my prayers and everything just goes out to his family.

Paula Mickens, Harris's mother, testified that Harris had always been a good child. He said that since elementary school Harris had gone to church, fed the homeless, sung in the choir, and played basketball. Ms. Mickens sympathized with Redell King's family and asked for the court to have mercy in sentencing her son:

> [M]y heart goes out to your family, M[r]s. King. I understand what you are going through. I hate it happened, but I know that my son is innocent, he did not do that. And I am so sorry [about] what Mr. King is going through. My heart goes out [to you]. I have a special need[s] child that I adopted and I know, you know. He is bed-ridden, he is in diapers, he's blind, you know, and my heart just goes out to your family, for what has happened to you[r] son.

> But, [Harris], everybody that knows him, he's a very good person, . . . he would give the shoes off of his feet if someone needed them. So that is all I can say to the Court, have mercy on my son's soul, because I know, from a mother's point of view, he has always been that good child, never been in any trouble, always given a hand to people, you know, always lending people money, whatever they wanted.

Ms. Mickens stated that she knew her son was innocent and had been "innocent from the beginning."

Pastor Romalic Jones, the pastor at Interchanging Souls Church, testified that he had known Harris and Harris's family since the "early 2000's." Pastor Jones said that he had

engaged in one-on-one interactions with Harris and believed that Harris was a "good young man." He recognized that Harris had always asserted his innocence throughout the case.

Pastor Jones stated that in 2006 his brother was killed when someone committed a crime, and he was very sensitive about individuals who are accused of crimes or have committed crimes. He said, "[T]alking with [Harris] and knowing [Harris], listening to him, I began to tune in a little bit more about him and him maintaining his innocence." He said he was "comfortable with [Harris] maintaining his innocence." Pastor Jones acknowledged that he was not present at trial and did not hear the details from the witnesses who identified Harris as the shooter. He stated, "I am asking the Court to have mercy on a young man that I have had interactions with, over a period of time, and based on my judgment, he is a good young man."

Darryl Mickens, Harris's stepfather, testified that he had been in Harris's life for the last fifteen years and had watched him mature. Mickens said that he sympathized with Redell King and his family and that he prayed for them. He stated that he helped raise Harris and had taught him right from wrong. Mickens said he believed Harris when he said he was innocent "because of the relationship and bond that [they had] grown to have over the years." He said, "I've taught [Harris], if you do something, be honest and be a man and step up and take responsibility for it. And [Harris] told me, again, I didn't do it. And I believe my son." Mickens said Harris was a "great, great young man" who had continued to improve himself as a person. He asked that the court have mercy on Harris."

## ANALYSIS

**I. Sufficiency of the Evidence.** Harris argues that the evidence is insufficient to sustain his convictions. Specifically, he claims that there is insufficient proof identifying him as the shooter, that there is insufficient proof that he intended to commit a knowing killing, and that his conviction for employment of a firearm during the attempt to commit a dangerous felony should not be upheld because there is insufficient proof to support his conviction for attempted second degree murder. We conclude that the evidence is sufficient to sustain all of Harris's convictions.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Similarly, Rule 13(e) of

the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. Id.

A. **Identity as Shooter.** Harris argues that the evidence is insufficient to prove his identity as the shooter beyond a reasonable doubt in all of his convictions. First, he claims that although Carter and Allen identified him at trial as the shooter, their prior statements call these identifications into question. He asserts that Carter told Lieutenant Cunningham that he could not identify the shooter because it was too dark and he ran when the shooting began. Similarly, he states that although Allen told Lieutenant Cunningham that he did not know anyone in the shooter's group and that it was too dark to see the shooter, Allen testified at trial not only that he knew Harris but also that Harris sold him a dog prior to the incident. Second, Harris argues that no one was able to identify him as the shooter of the second round of shots and that another member of his group could have fired the shots at King, Allen, Carter, Mickens, and Kassama while the initial shooter was preoccupied with O'Bannon, who ran in the opposite direction from his friends. We conclude that the direct and circumstantial proof established Harris as the shooter in all the offenses in this case.

"The identity of the perpetrator is an essential element of any crime." Rice, 184 S.W.3d at 662 (citing State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975)). The State has the burden of proving the identity of the defendant as the perpetrator beyond a reasonable doubt. State v. Cribbs, 967 S.W.2d 773, 779 (Tenn. 1998). Identity may be established by direct evidence, circumstantial evidence, or a combination of the two. Thompson, 519 S.W.2d at 793. "The credible testimony of one identification witness is sufficient to support

a conviction if the witness viewed the accused under such circumstances as would permit a positive identification to be made." State v. Radley, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999) (citing State v. Strickland, 885 S.W.2d 85, 87-88 (Tenn. Crim. App. 1993)). The identification of the defendant as the perpetrator is a question of fact for the jury after considering all the relevant proof. State v. Thomas, 158 S.W.3d 361, 388 (Tenn. 2005) (citing Strickland, 885 S.W.2d at 87). In addition, as relevant here, this court has held that "the testimony of a victim, by itself, is sufficient to support a conviction." Strickland, 885 S.W.2d at 87 (citing State v. Williams, 623 S.W.2d 118, 120 (Tenn. Crim. App. 1981)).

In this case, Harris and his mother testified that Harris was at home asleep at the time the offenses occurred, thereby presenting an alibi for the first time at trial. We note that the jury may reject an alibi defense. State v. Cate, 746 S.W.2d 727, 729 (Tenn. Crim. App. 1987). "The defense of alibi presents an issue of fact determinable by the jury, as the exclusive judges of the credibility of the witnesses in support of that defense, and of the weight to be given their testimony." State v. Crawford, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982) (citing Green v. State, 512 S.W.2d 641, 643 (Tenn. Crim. App. 1974)). In this case, the jury rejected the alibi defense offered by Harris and his mother, as was its prerogative.

Although Harris claims that the State failed to prove his identity as the shooter in all the offenses in this case, a total of four witnesses identified Harris as the shooter at trial. A week after the offenses, King and Carter identified Harris as the shooter in a photographic lineup and were one hundred percent certain of their identifications. Moreover, at the preliminary hearing and at trial, King, Carter, Allen, and O'Bannon, without reservation, identified Harris as the individual who pointed a gun at them on March 18, 2008. King testified that he remembered Harris's face, particularly Harris's chin and facial expression during the incident. Allen said that he recognized Harris because he had sold him a puppy a year earlier and that he had told the police that Harris went by the nickname of "Phil." O'Bannon testified that he recognized Harris because he had seen him "[a]round the area," and that Harris stood out because he was "the tallest one out there." Carter testified that he would never forget Harris's face because the incident felt "like a nightmare."

The proof showed that Harris fired several shots at O'Bannon. O'Bannon testified that Harris pointed his gun at his face and neck and that Harris fired the first shot when he was ten to fifteen feet away from him. When he saw the gunfire from Harris's first shot, O'Bannon closed his eyes because he thought he had been hit. He also said he heard several more gunshots as he ran toward Ross Road. King testified that he saw Harris fire four or five shots at O'Bannon and saw the fire coming from Harris's gun when he fired these shots. Allen and Carter stated that they saw Harris fire two or three shots at O'Bannon.

-23-

The evidence also shows that Harris left the crime scene in a green Ford Expedition. Cleveland, who lived on Nelson Way Drive, testified that after hearing two or three gunshots, he saw at least two men, approximately twenty years old, quickly get into a green Ford Expedition and leave the scene. One of the 9-1-1 callers stated that she observed subjects getting into a green Ford Expedition. Deputy Chapman testified that he observed Harris drive by in a green Ford Expedition and park it outside his home. Detective Goforth subsequently searched the Ford Expedition and found a pair of men's shoes under the seat and a direct deposit slip from the Hershey Company payable to Harris.

Moreover, the shell casings, gun, and ammunition recovered from Harris's bedroom indicate that Harris committed the offenses in this case. Sergeant Sneed collected nine .40 caliber shell casings near the home located at 6665 Nelson Way Drive. After examining these shell casings, Agent Betts concluded that all nine of them had been fired from the same gun. Sergeant Harris, during the search of Harris's home, found a gun box, a holster, a shooting target, and .40 caliber bullets near Harris's bed. Notably, the Mauser M2 .40 caliber, semi-automatic handgun was missing from the gun box and four bullets were missing from the box of ammunition. Although Harris acknowledged that the items found in his room belonged to him, he denied discarding his .40 caliber semi-automatic handgun and claimed he noticed that it was missing when the police conducted their search of his room.

Furthermore, the evidence shows that Harris had time to commit these offenses before arriving at work. Officer Stroud testified that the incident in this case occurred on March 18, 2008, between 7:40 p.m. and 8:00 p.m. Both Harris's home and the home at 6665 Nelson Way Drive were thirty to thirty-five minutes from the Hershey Company's factory downtown. Harris scanned his badge at the Hershey Company's parking lot at 8:43 p.m. and scanned his badge at the company's building at 8:47 p.m. Consequently, this proof allows for Harris to have committed the offenses in this case before arriving at the company's parking lot at 8:43 p.m.

Finally, there is strong circumstantial evidence indicating that Harris fired the second round of shots in the direction of Carter, Allen, Mickens, and King as they were running away. The evidence presented at trial was that Harris approached King, Allen, Carter, Kassama, and Mickens, pointed his guns at them, and informed them that he would shoot them if they moved. King, Allen, and Carter testified that after they saw Harris fire several shots at O'Bannon, they, along with Kassama and Mickens, ran through a gate to Curtis's backyard. As they were trying to jump the fence, they heard additional gunshots. Allen testified that Harris probably shot toward them when they ran and that he heard "constant" gunshots as he was running away from the scene. Carter stated that when he got to the top of the fence, he heard three or four gunshots in their direction, two of which hit the fence.

King, Allen, O'Bannon, and Carter all testified that Harris was the only person that they saw with a weapon during the incident.

Viewed in a light most favorable to the State, the aforementioned evidence is sufficient to establish Harris as the shooter in all the offenses in this case. Because a rational jury could have found that Harris committed the offenses in this case beyond a reasonable doubt based on this evidence, he is not entitled to relief.

**B.** **Attempted Second Degree Murder.** Harris argues that the evidence is insufficient to sustain his conviction for attempted second degree murder because the State failed to prove beyond a reasonable doubt that he intended to commit a knowing killing of Paul O'Bannon. Instead, he argues he should have been convicted of reckless endangerment because the shooter's conduct was reckless and placed the victim in imminent danger of death or serious bodily injury. Harris claims that although the shooter threatened to physically assault O'Bannon, he never threatened to kill him. He also argues O'Bannon was able to escape on foot unharmed even though the proof showed that the shooter was armed with two guns and was only a few feet away from O'Bannon at the time he fired the shots and that he had taken target training classes in order to get his firearm carry permit. We conclude that the evidence is sufficient to sustain Harris's attempted second degree murder conviction.

Second degree murder is the "knowing killing of another." T.C.A. § 39-13-210(a)(1). "A person acts knowingly . . . when the person is aware that the conduct is reasonably certain to cause the result." Id. § 39-11-302(b). As relevant here, "[a] person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part[.]" Id. § 39-12-101(a)(2). A person commits the offense of reckless endangerment "who recklessly engages in conduct that places or may place another person in imminent danger of death or serious bodily injury." Id. § 39-13-103(a). Reckless endangerment as charged in this case is a Class A misdemeanor. Id. § 39-13-103(b)(1).

A defendant's mental state is a factual question for the jury to resolve. State v. Brown, 311 S.W.3d 422, 432 (Tenn. 2010) (citations omitted). The Tennessee Supreme Court has explained that circumstantial evidence is often the only means of proving mental state: "[W]hile a defendant's mental state is rarely subject to proof by direct evidence, it is within the authority of the jury to infer the defendant's intent, and, therefore, whether the defendant acted 'knowingly,' from surrounding facts and circumstances." Id. (citations and quotations marks omitted).

In order to sustain a conviction for attempted second degree murder, the proof must show that Harris intended to kill O'Bannon and, in firing his gun or guns, believed that he would be killed. See T.C.A. §§ 39-12-101(a)(2); 39-13-210(a)(1). Taken in the light most favorable to the State, the evidence shows that Harris, who was armed two guns, approached O'Bannon, who was unarmed, to help the men in his group assault him. O'Bannon eventually escaped the assault and ran away. O'Bannon testified that Harris pointed a gun at his face and neck and was ten to fifteen feet away when he fired the first shot at him. O'Bannon said that when he saw the gunfire from Harris's first shot, he closed his eyes because he thought he had been hit. He also stated that he heard several more gunshots as he ran toward Ross Road. Similarly, King, Allen, Carter, and O'Bannon all testified that Harris followed O'Bannon and fired several gunshots at him before he disappeared. In light of the guilty verdict for attempted second degree murder, the jury, based on all the proof presented at trial, apparently concluded that Harris fired at O'Bannon with the intent of killing him and that, if not for O'Bannon's good fortune, he would have died at the hands of Harris. Because the jury is the exclusive trier of fact, we will not reweigh or reevaluate the evidence. Accordingly, we conclude the evidence is sufficient to sustain Harris's conviction for attempted second degree murder.

**C. Unlawful Employment of a Firearm During the Attempt to Commit a Dangerous Felony.** Harris argues that because the evidence is insufficient to support the attempted second degree murder conviction, his conviction for employment of a firearm while attempting to commit a dangerous felony should not be upheld. He claims he should have been convicted of the lesser included offense of misdemeanor reckless endangerment, which is not a dangerous felony pursuant to Tennessee Code Annotated section 39-17-1324(i)(1). We conclude that Harris is not entitled to relief because we have already held that the evidence is sufficient to sustain his conviction for attempted second degree murder.

Employing a firearm during an attempt to commit a dangerous felony is a Class C felony. Id. § 39-17-1324(b)(2), (h)(1). Attempted second degree murder is defined as a dangerous felony pursuant to Code section 39-17-1324. Id. § 39-17-1324(i)(1)(B). As we previously noted, second degree murder is the "knowing killing of another." Id. § 39-13-210(a)(1). We conclude there is sufficient evidence to support Harris's conviction for employment of a firearm during the attempt to commit second degree murder. The proof at trial showed that Harris chased and fired several shots at O'Bannon as he ran away. Because the evidence is sufficient to support the conviction of attempted second degree murder, Harris is not entitled to relief.

**II. Sentencing.** Harris contends that the trial court abused its discretion in sentencing him to twelve years of confinement for his attempted second degree murder conviction in count two. In particular, he claims that the trial court erred in applying enhancement factor

that the personal injuries inflicted upon the victim were particularly great because there was no evidence that the victim in count two, Paul O'Bannon, received any injuries. See id. § 40-35-114(6). He asserts that the trial court "seriously misapplied" this enhancement factor by erroneously concluding that the victim in count two was Redell King, who suffered a gunshot wound during the incident rendering him a paraplegic, rather than Paul O'Bannon, who suffered no injuries. See id. § 40-35-114 (stating that enhancement factors must be "appropriate for the offense"). Because the proof showed that King and his friends ran away from the scene before a second round of shots was fired, Harris reasons that the jury chose to convict him of attempted second degree murder only as to the attack on O'Bannon and chose to convict him of the lesser offense of reckless endangerment as to the offenses against King and the other victims. He also asserts that the trial court imposed the maximum sentence for his reckless endangerment conviction as to King in count one. Consequently, Harris argues that the trial court abused its discretion in applying this enhancement factor to count two involving O'Bannon and that the misapplication of this factor was such a departure from the sentencing act that the sentence of twelve years cannot be upheld. The State concedes that the trial court erred in applying enhancement factor (6) to the attempted second degree murder conviction but asserts that the trial court did not abuse its discretion because it imposed a within-range sentence consistent with the purposes and principles of the sentencing act. Because the record shows that trial court erroneously applied enhancement factor (6), based on its mistaken belief that the victim in this count was rendered a paraplegic because of Harris's crime, and erroneously applied enhancement factor (9), in light of Harris's conviction for employment of a firearm during the attempt to commit a dangerous felony, we affirm Harris's convictions and remand for resentencing as to the attempted second degree murder conviction in count two.

We note that the 2005 amendments to the sentencing act "served to increase the discretionary authority of trial courts in sentencing." State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012). In light of this broader discretion, "sentences should be upheld so long as the statutory purposes and principles, along with any applicable enhancement and mitigating factors, have been properly addressed." Id. at 706. Moreover, "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." Id. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld." Id. Therefore, this court reviews a trial court's sentencing determinations under "an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. at 707.

Pursuant to the 2005 amendments to the sentencing act, a trial court must consider the following when determining a defendant's specific sentence:

> (1) The evidence, if any, received at the trial and the sentencing hearing;
> (2) The presentence report;
> (3) The principles of sentencing and arguments as to sentencing alternatives;
> (4) The nature and characteristics of the criminal conduct involved;
> (5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;
> (6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and
> (7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

T.C.A. § 40-35-210(b). The defendant has the burden of showing the impropriety of the sentence on appeal. Id. § 40-35-401(d), Sentencing Comm'n Comments. In determining the proper sentence, the trial court must consider the defendant's potential for rehabilitation or treatment. Id. §§ 40-35-102, -103. In addition, the court must impose a sentence "no greater than that deserved for the offense committed" and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Id. §§ 40-35-103(2), (4).

The trial court determined that none of the mitigating factors applied to Harris's sentence in count two. In reaching this decision, the court acknowledged that defense counsel "urges that [Harris] is a nice boy and I appreciate the Reverend's testimony and his famil[y's] testimony that they don't think that he's capable of this, or didn't do this. That is true in a lot of offenses, very nice people can commit very bad crimes."

In count two, the trial court applied enhancement factor (1), that the defendant had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range, because Harris had a prior conviction for unlawful use of drug paraphernalia, a misdemeanor. Id. § 40-35-114(1). The court stated that it did not give this enhancement factor "a lot of weight" because it was a marijuana offense. The court also applied enhancement factor (6), that the personal injuries inflicted upon the victim were particularly great. Id. § 40-35-114(9). Regarding its decision to apply factor (6), the court stated that it was giving "great weight to this factor, in count two" because "the only other injury where it could be greater would be if the victim w[ere] in a coma, or vegetated state, or had died." The court added, "I don't give [enhancement factor (6)] any weight in counts one, three, four, five, or six, they are misdemeanors, but there was no injury in those counts to those victims." Finally, the court applied enhancement factor (9), that the defendant possessed or employed a firearm during the commission of the offense. Id. § 40-35-114(9).

In applying this factor to the attempted second degree murder conviction in count two, the court noted, "One can attempt to murder someone, knowingly, without a weapon . . . . So it is not an element of th[at] offense." The court determined that Harris was a Range I, standard offender rather than an especially mitigated offender because he had not applied mitigating factors and had applied enhancement factors his sentences. Id. § 40-35-109(a).

Because Harris was convicted of attempted second degree murder, he faced a sentence of eight to twelve years. Id. §§ 40-35-112(a)(2). In determining the appropriate sentence, the court stated, "As to the criminal attempt murder, second degree, with the amount of injury to the victim, particularly, I think that a twelve[-]year sentence is justified.

We conclude, as conceded by the State, that the trial court erred in applying enhancement factor (6) to the conviction for attempted second degree murder based on its misconception that the victim in count two was Redell King. Moreover, although not raised as an issue by Harris, we further conclude that the trial court erred in applying enhancement factor (9) to the sentence in count two for attempted second degree murder. Typically, enhancement factor (9) may be applied to an attempted second degree murder conviction because "[t]he use of a gun is neither an element of [attempted] second degree murder nor inherent in the offense." State v. Hampton, 24 S.W.3d 823, 832 (Tenn. Crim. App. 2000). However, this court has held that enhancement factor (9) should not be applied to an attempted second degree murder conviction where, as here, "the defendant was separately indicted and convicted of the offense of employing a firearm during the commission of the attempted murder." State v. Brian Hervey, No. W2010-00675-CCA-R3-CD, 2011 WL 1225725, at *9 (Tenn. Crim. App. Mar. 31, 2011).

Given the specific and rather unique circumstances present in this case, we cannot be certain that the trial court would have sentenced Harris to the maximum sentence for the attempted second degree murder conviction in count two if it had not applied enhancement factors (6) and (9). See Bise, 380 S.W.3d at 706 n.41 (noting that "the trial court is in a superior position to impose an appropriate sentence and articulate the reasons for doing so"); State v. Lawrence Brown, No. M2011-01156-CCA-R3-CD, 2012 WL 2870572, at *4 (Tenn. Crim. App. July 13, 2012) (remanding for resentencing after holding that the trial court erred in applying two out of three enhancement factors); State v. Jeffrey B. Johnson, Jr., No. M2010-01721-CCA-R3-CD, 2012 WL 2356553, at *5-6 (Tenn. Crim. App. June 20, 2012) (remanding for resentencing after concluding that the record was inadequate for review and that the trial court erroneously limited its consideration of evidence at sentencing to that which was supported by the jury's verdict and erroneously applied both enhancement factors). We question whether the remaining enhancement factor (1), applied for Harris's misdemeanor conviction for unlawful use of drug paraphernalia, justifies a twelve-year sentence. The record shows that the trial court focused on Redell King's injuries in imposing

the twelve-year sentence for the offense involving Paul O'Bannon and did not provide other reasons, consistent with the purposes and principles of the sentencing as stated in Code sections 40-35-102, -103, and -210, justifying the sentence in count two. Cf. State v. Cross, 362 S.W.3d 512, 529-30 (Tenn. 2012) (holding that the trial court's sentencing decision was justified because "the trial court emphasized a variety of considerations beyond the enhancement factors which [were] consistent with the principles and policies of sentencing" and "also placed appropriately significant weight on two other [applicable] enhancement factors"). On this record, we are unable to determine whether it would have imposed the maximum sentence for the attempted second degree murder conviction after applying only enhancement factor (1). See Bise, 380 S.W.3d at 706 n.41 (noting that "appellate courts cannot properly review a sentence if the trial court fails to articulate in the record its reasons for imposing the sentence" and asserting that although appellate courts "have the statutory authority to modify the sentence, see Tenn. Code Ann. §§ 40-35-401(c)(2), -402(c) (2010), the more appropriate course of action under such circumstances may be to remand to the trial court" (citing T.C.A. §§ 40-35-401(c)(3), -402 (c)). For this reason, Harris's convictions are affirmed and the case is remanded for resentencing as to the conviction for attempted second degree murder.

## CONCLUSION

Upon review, we affirm Harris's convictions and remand for resentencing as to the attempted second degree murder conviction in count two.

_____
CAMILLE R. McMULLEN, JUDGE